1   **LAW OFFICES OF RICHARD HAMLISH**
    **910 HAMPSHIRE ROAD, SUITE G**
2   **WESTLAKE VILLAGE, CALIFORNIA 91361-1407**
    **Telephone: (805)497-6632**
3   **FAX: (805)497-2703**
    **SBN 122389**
4

5   Attorney for Plaintiffs
    Zone Sports Center, LLC
6   Fresno Rock Taco, LLC
    Milton Peter Barbis
7

8

9               **UNITED STATES DISTRICT COURT**

10          **FOR EASTERN DISTRICT OF CALIFORNIA**

11                    **FRESNO DISTRICT**

12   ZONE SPORTS CENTER, INC. LLC,      )   CASE NO.
     a California limited liability company;  )
13   FRESNO ROCK TACO, LLC., a         )   COMPLAINT FOR DAMAGES FOR
     California limited liability company;  )   VIOLATION OF LANHAM ACT,
14   MILTON  PETER  BARBIS,  an        )   SHERMAN ACT, CLAYTON ACT,
     individual,                        )   RICO,  CARTWRIGHT  ACT,
15                                      )   CALIFORNIA FRANCHISE ACT,
                           Plaintiff,   )   BREACH  OF  CONTRACT,
16                                      )   RESCISSION  OF  CONTRACT,
                   v.                   )   MAIL  FRAUD;  WIRE  FRAUD,
17                                      )   COMMON  LAW  FRAUD,
     RED HEAD, INC, dba Cabo Wabo       )   INTENTIONAL  INFLICTION  OF
18   Enterprises a California corporation;  )   EMOTIONAL  DISTRESS,  and
     SKYY SPIRITS, LLC, a California    )   INTENTIONAL  INTERFERENCE
19   limited liability company; GRUPPO  )   WITH PROSPECTIVE ECONOMIC
     CAMPARI, a business of unknown     )   ADVANTAGE
20   corporate status; SAMMY HAGAR, an  )
     individual; MARCO MONROY, an       )
21   individual; and DOES 1-10, inclusively  )   (15 U.S.C. §1 et seq., 15 U.S.C. §14
                                        )   et. seq.; 15 U.S.C. §1051 et seq.,. §15
22                          Defendants.  )   U.S.C. §1100 et seq., . 18 U.S.C.
                                        )   §1961 et seq., Cal. Corp. Code §31000
23                                      )   et seq.)
                                        )
24                                      )
                                        )   DEMAND FOR JURY TRIAL
25   ─────────────────────────────────  )

26   NOW COMES ZONE SPORTS CENTER, INC. LLC,,  FRESNO ROCK TACO,

27   LLC., and MILTON PETER BARBIS, who alleges as follows:

28   ///

## JURISDICTION

1.     This cause of action arises, in part, under 15 U.S.C. §1 et seq., 15 U.S.C. §14 et seq., 15 U.S.C. §1051 et seq., 18 U.S.C. §1841, 18 U.S.C. §1843, §18 U.S.C. §1961 et seq., as well as California Business and Professions Code §16720 et seq.,  California Corporations Code §31000 et seq, and other selected sections of the United States Code and the  California Code, wherein plaintiffs seek to redress deprivations of rights secured to him by the Constitution and statutes of the United States of America and the State of California.

2.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331, §1337, §1339, and §1367.

3.     The venue is proper in that the events took place in the County of Fresno, State of California which is within the jurisdiction of this court.

## PARTIES

4.    Zone Sports Center, LLC dba Granite Park (hereinafter ZSC") is and was, at all times relevant to this action, a California limited liability company doing business in the County of Fresno, State of California.

5.     ZSC is a third party beneficiary to the License Agreement dated December 7, 2006 between  Red Head, Inc. dba Cabo Wabo Enterprises (hereinafter "RHI") and Fresno Rock Taco, LLC., dba Cabo Wabo Cantina Fresno (hereinafter "FRT") .

6.     Fresno Rock Taco, LLC., dba Cabo Wabo Cantina Fresno (hereinafter "FRT") was, at all times relevant to this action, a California limited liability company doing business in the County of Fresno, State of California,

7.    Milton Peter Barbis is and was, at all times relevant to this action, a resident of the County of Fresno, State of California,.

8.    Red Head, Inc. dba Cabo Wabo Enterprises (hereinafter "RHI") is and was, at all times relevant to this action, a California corporation.

9.    Skyy Spirits, LLC. (hereinafter "Skyy") is and was, at all times relevant to this action, a California limited liability company.  Skyy is a wholly owned subsidiary of Gruppo Campari. Skyy manufactures and distills alcoholic beverages including but not limited to Cabo Wabo tequila. Skyy is the licensor and owner of Cabo Wabo tequila.

10.    Gruppo Campari, (hereinafter "Campari") is a business of unknown corporate organization doing business in California.  Campari owns Skyy.

11.    Sammy Hagar is and was, at all times relevant to this action, a resident of the State of California and president of Red Head, Inc.

12.    Marco Monroy is and was, at all times relevant to this action, a resident of the State of California.

13.    The true names of defendants Doe 1 through 10, inclusive, is now unknown to plaintiffs who therefore sues said defendants by such fictitious names but upon ascertaining the true identity of each Doe defendant, plaintiffs will substitute same or seek leave to do so, in lieu of such fictitious name.

14.    Plaintiffs are informed and believes and based thereon allege that each of the above named defendants are in some way responsible for the injuries of plaintiffs herein complained of.

15.    Plaintiffs are informed and believes and based thereon allege that each said Doe defendants is in some way responsible for plaintiffs' injuries herein complained of.

///

///

## SUMMARY OF MATERIAL FACTS

16.     RHI is the licensor and owner of the trademark "Cabo Wabo Cantina" which is the mark for restaurant and bar services, nightclub services, retail store services and on-line retail store services.

17.     RHI is also the licensor and owner of the trademark "Cabo Wabo" which is the mark for restaurant and bar services, nightclub services, retail store services and on-line retail store services.

18.     RHI is not the licensor or the owner of the trademark "Cabo Wabo tequila."

19.     On or about December 7, 2006, FRT entered into a purported License Agreement (hereinafter "Agreement") with RHI to develop a Cabo Wabo Cantina (hereinafter "Cantina") in Fresno California.

20.     The Agreement provided that FRT was licensed to use the trademarks "Cabo Wabo Cantina" and "Cabo Wabo."

21.     The goods and services listed in the Agreement are restaurant and bar services, nightclub services, retail store services and on-line retail store services.

22.     The Agreement contained no clause relating to the brands of alcoholic beverages which were to be served by FRT in that RHI does not own or license the trademark Cabo Wabo tequila..

23.      The Agreement is a hidden franchise agreement and as a matter of public policy, void on its face in that:

a.     It was marketed as a license not a franchise.

b.     RHI did not register the offering pursuant to California Corporations Code §31000 et seq.;

c.      RHI willingly and knowingly made false and untrue statements in the Agreement;

d.      RHI, Hagar and Monroy made false and untrue statements to FRT, ZSC and Barbis to induce FRT to execute the Agreement.

e.      The Agreement further provides:

1)      For use of RHI's trademarks of Cabo Wabo Cantina and Cabo Wabo.

2)      FRT was required to pay $100,000 as an up front fee upon the execution of the License Agreement and an additional $75,000.00 thereafter.

3)      RHI was to design the facility.

4)      RHI was to train all food service staff before the opening and on a continuing basis thereafter.

5)      RHI was to provide, at its own expense, FRT with the elements of the Cabo Wabo Cantina System including without limitation marketing plans, and techniques, training manual, food names, food and beverage recipes, food and beverage preparation techniques, menus, trade dress, styles, décor, training materials, and operating technologies.

24.     On March 7, Hagar announced at a press conference in San Francisco that RHI had licensed FRT for a Cantina to be located in Fresno, California.

25.     Hagar made the abovementioned announcement without the knowledge or approval of FRT and in violation of an oral agreement not to make the announcement in any other location except Fresno, California.

26.      As a result of the premature announcement, FRT suffered from

1   adverse publicity in the local press in Fresno, California.

2       27.   Based on the announcement, the construction lender approved money
3   for the construction of the Cantina without final construction plans and without the
4   knowledge of FRT who was obliged to work with and pay the construction lender.

5       28.   Construction schematic drawings were completed and approved over
6   the initial three month period following the signing of the License Agreement, i.e.
7   approximately March 23, 2007.
8
9       29.   The construction drawings approval process went through RHI's
10  architect, restaurant consultant and project manager, and Monroy who is an
11  architect and manages all operations of the Cabo Wabo Cantina in Cabo San Lucas.

12      30.   Subsequently, FRT executed a lease with ZSC for the premises where
13  the Cantina was to be located.   The lease was for 10 years at an approximate
14  average monthly rental of $38,560.00.

15      31.   On or about April 6. 2007, relying on the execution of the Agreement
16  between RHI and FRT, the approval of the construction drawings for the Cantina
17  by RHI, and the 10 year lease between FRT and ZSC, ZSC began construction on
18  the $10 million building especially built for a Cantina for FRT as per the
19  construction drawings approved by RHI.

20      32.   ZSC then sought other tenants for Granite Park and ultimately executed
21  leases with nine additional tenants at the Granite Park location; Fine Irishmen, Me-
22  N-Ed's Victory Grill, RED, Memphis Blues, Bistro Las Caux, Touchstone
23  Climbing Gyms, Le Reve Catering and the Forest Theme Park.
24
25      33.   ZSC began and completed construction for buildings for the Fine
    Irishman and Victory Grill.
26
27      34.   ZSC entered into the aforementioned leases solely on the basis that
28  the Cantina would be opened in that location and the  Cantina was to be the anchor

tenant in the Granite Park entertainment center.

35.  During the entire construction process Hagar, Monroy and RHI micro-managed the design and construction of the Cantina building and Cantina interior. The micro-management was administered down to such detail of how and where plants and trees were planted outside the Cantina, designs on the floor and heights of soffits above the bar. The micro-management of the construction caused great delays and enormous additional expenses to ZSC.

36.  The interest expense caused by the delays in construction was over $2 million.

37.  Subsequently, Hagar demanded that construction be halted on the building construction because Hagar wanted to make a major change in the outside appearance of the building. The change he demanded made was to add a forty foot high lighthouse to the exterior of the building. The addition of the lighthouse by Hagar was not a part of other Cabo Wabo Cantinas [Harrah's Cabo Wabo Lake Tahoe and two other proposed cantinas].

38.  The abovementioned change was substantial enough to change the entire layout of the exterior of the building and change the entrance to the Cantina. The entire people flow of the internal operations of the Cantina was changed. These changes caused a nine month delay in the completion of the construction of the Cantina.

39.  On June 17, 2007, RHI began interviewing potential candidates for chef for FRT although the exterior of the building had not been completed and the interior restaurant design drawings were not yet complete.

40.  During the period January 2007 through August 2008, many obstacles, in addition to the construction changes and delays, were placed in the path of FRT and ZSC, which made it difficult to complete the construction and open the

Cantina:

    a.      On December 28, 2007, FRT learned for the first time, that there was no Cabo Wabo Cantina System in existence as was represented in the Agreement and by RHI, Hagar and Monroy.

    b.      FRT was forced to attempt to create a restaurant operational system and menus at its own expense even though the Agreement represented that the restaurant operational system was in place and paid for by RHI. RHI refused to pay for the restaurant operational system.

    c.      In spite of the fact that RHI failed to provide a restaurant operational system and then refused to pay the cost of creating one, RHI demanded that every aspect of the menu and operating system that FRT was designing was to be submitted to RHI, Monroy and Hagar for their approval. This approval process delayed the creation of an operational system to the extent, that it was never completed. FRT would submit a system to RHI, who would approve it and then submit it to Monroy who would approve it. Monroy would submit the plan to Hagar who delayed responding to FRT's system design to the extent the system was never completed and never implemented.

    d.      On March 25, 2008, RHI demanded that FRT forward a complete restaurant operational system and menus that FRT had created thus far so that RHI could use the menu and system to market the license/franchise to a potential buyer in Dubai.

41.    When FRT attempted to enroll sponsors for the Cantina, RHI warned FRT on June 16. 2008 that FRT could not sign any sponsorship proposals with any vendor and that any funds received from sponsorships proposals sold by FRT belonged to RHI not FRT.

42.   Also in June 16, 2008, contrary to the terms of the Agreement, FRT was informed that if and when RHI created a Cabo Wabo beer, FRT would be required to carry that beer as the "house pour."

43.   On August 14, 2008, contrary to the terms of the Agreement, FRT was informed that RHI, Skyy and Campari required that the Wabo Cabo brand tequila would be serviced exclusively as the well drink in the Cantina.  No other tequila would be permitted

44    RHI, Skyy and Campari demanded that all other tequilas had to be hidden out of sight and be served as call drinks only.

45.   FRT received an email from the president of the Cabo Wabo Tequila brand i.e. SKYY Spirits/CAMPARI stating that they were in complete agreement with RHI/Hagar and that FRT must use Cabo Wabo tequila as the well drink and on all menu items.  All other tequila must be kept out of sight.

46.   The above mentioned requirements in ¶42 and ¶43 were a material change to the Agreement and material difference from the requirements at Harrah's Cabo Wabo Cantina Lake Tahoe.  FRT did not agree to this requirement.

47.   When Barbis and FRT asked Hagar why FRT wasn't allowed to use the beer and tequila that was most profitable to FRT, Barbis was told by Hagar "because I fucking said so."  Hagar stated "I'm a hall of fame rock star, I can do what I want."

48.   Hagar also stated that because FRT was challenging him and disagreeing with him, Hagar  was not going to appear for the grand opening as per the terms and conditions in the Agreement.   This was a material breach of the Agreement.

49.   Hagar and RHI told FRT that RHI would terminate the license if FRT did not do what Hagar, Monroe and RHI, Skyy and Campari told FRT to do.

50.   Hagar then left a message on Barbis' voicemail stating multiple times that "I am going to fucking kill you."

51.   The abovementioned message, recorded on the voicemail, was played to multiple people to hear and attest to. When the message was played to Monroy he looked shocked and was very disturbed by the message.

\   52.   Monroy then grabbed Barbis' cell phone and erased the message.

53.   RHI required that FRT to use Hagar's sound system manager to design, build and install the sound system. During the marketing of the Cantina to FRT, RHI and Hagar estimated to FRT that a budget of $200,000 for the sound, lighting and television entertainment system was adequate.

54.   RHI and Hagar demanded that FRT use Hagar's personal sound system manager. When construction on the sound system was finished, the costs had ballooned to $484,000. The sound system manager told Barbis that FRT had to do what it was told or he will report it to Hagar and Hagar would terminate the Agreement.

55.   It was a common practice in the Fresno market at that time to charge a cover charge for entering nightclubs. The various clubs' charges ranged from $10 to $25.

56   FRT decided to charge $20,

57.   Although the agreement is silent on a cover charge, Hagar, Monroy and RHI threatened FRT stating that FRT was not allowed to charge a cover charge and if it did, it was in violation of the marketing procedures, and would be a violation of the Agreement.

58.   The Cantina finally opened on August 28, 2008.

59.   During the first two months of the operations of the Cantina, the average nightly attendance ranged between 1,800 people and 2,400 people.

-10-

60.    This lack of a cover charge policy cost the plaintiff $2.4 million over the first two months of the business.

61.    The construction delays, the interest on the construction loan and the lack of a cover charge resulted in almost 5.5 million dollars in out-of-pocket costs and lost revenue.

### FIRST CAUSE OF ACTION

(Violation of Sherman Act, 15 U.S.C. §1 et seq.)

(against RHI, Skyy and Campari )

(by FRT and ZSC)

62.    Plaintiff refers to and repleads each and every allegation contained in paragraphs 1 through 61 and each of them inclusively and by this reference incorporates the same herein and makes each a part thereof.

63.    The Agreement contains no clause or provision relating to the brand of alcoholic beverages which were to be served by FRT in the Cantina.

64.    On or about August 14, 2008, two weeks before the grand opening of the Cantina, Skyy and Campari advised FRT that it could only serve Cabo Wabo tequila in the Cantina.  FRT was warned by RHI, Skyy and Campari that if FRT sold any other brand of tequila, FRT would be in violation of the Agreement and RHI would terminate the Agreement.

65.    RHI, Skyy and Campari tied the exclusive selling of Cabo Wabo tequila to the Agreement including a threat to terminate the Agreement if FRT did not comply.

66.    RHI, Skyy and Campari tied the exclusive sale of Cabo Wabo tequila as a condition of continuing to be a Licensee of RHI, in violation of 15 U.S.C. §1 et seq..

67.     Based on the pro forma analysis by RHI given to FRT during the marketing stage, FRT would have operating income of $19,788,982.00 over the first ten years.

68.     As a proximate cause of the aforementioned acts and omissions of Defendants, and each of them, and by reason thereof, ZSC was deprived of an approximate average monthly rental income from FRT in an amount of $38,560.00. The FRT/ZSC lease was a ten year lease.   The total rental loss to ZSC is approximately $4,627,000.00.  ZSC is entitled to treble damages in the amount of $12,960,000.00.

69.     As a proximate cause of the aforementioned acts and omissions of Defendants, and each of them, FRT was deprived of operating income of $19,788,982.00 or an estimated $12,000,000.00 after tax profits.  RHI is entitled to treble damages in the amount of $59,366,946.00.

70.     As a proximate cause of the aforementioned acts and omissions, FRT has incurred actual losses of $5,500,000.00.  FRT is entitled to treble damages in the amount of $16,500, 000.00.

71.     By reason of the aforementioned acts and omissions of defendants, FRT and ZSC were required to and did retain several attorneys to defend themselves in many the civil actions against them which resulted from the violations by RHI, Skyy and Campari, and to render legal assistance to FRT and ZSC that they might vindicate themselves from in any civil action; and by reason thereof, plaintiffs request payment by RHI, Skyy and Campari of all attorney's fees and litigation costs incurred in those proceedings.

72.     By reason of the aforementioned acts and omissions of Defendants, FRT and ZSC were required to and did retain an attorney to institute and prosecute the within action, and to render legal assistance to FRT that they might vindicate the loss and impairment of its aforementioned rights; and by reason thereof, FRT

requests payment by Defendants of reasonable attorney's fees pursuant to applicable statute.

## SECOND CAUSE OF ACTION

(Violation of Cartwright Act, California Business & Professions Code §16720)

(against RHI, Skyy and Campari)

(by FRT and ZSC)

73.  Plaintiff refers to and repleads each and every allegation contained in paragraphs 1 through 72 and each of them inclusively and by this reference incorporates the same herein and makes each a part thereof.

74.  RHI, Skyy and Campari tied the exclusive sale of Cabo Wabo tequila as a condition of continuing to be a Licensee of RHI, in violation of California Business and Professions Code §167200 et seq.

75.  As a proximate cause of the aforementioned acts and omissions of Defendants, and each of them, and by reason thereof, ZSC was deprived of an approximate average monthly rental income from FRT in an amount of $38,560.00. The FRT/ZSC lease was a ten year lease.  The total rental loss to ZSC is approximately $4,627,000.00.  ZSC is entitled to treble damages in the amount of $12,960,000.00.

76.  As a proximate cause of the aforementioned acts and omissions of Defendants, and each of them, FRT was deprived of operating income of $19,788,982.00 or an estimated $12,000,000.00 after tax profits.  RHI is entitled to treble damages in the amount of $59,366,946.00.

77.  As a proximate cause of the aforementioned acts and omissions, FRT has incurred actual losses of $5,500,000.00.  FRT is entitled to treble damages in the amount of $16,500,000.00.

78.  By reason of the aforementioned acts and omissions of defendants,

FRT and ZSC were required to and did retain several attorneys to defend themselves in many the civil actions against them which resulted from the violations by RHI, Skyy and Campari, and to render legal assistance to FRT and ZSC that they might vindicate themselves from in any civil action; and by reason thereof, plaintiffs request payment by RHI, Skyy and Campari of all attorney's fees and litigation costs incurred in those proceedings.

79.    By reason of the aforementioned acts and omissions of Defendants, FRT and ZSC were required to and did retain an attorney to institute and prosecute the within action, and to render legal assistance to FRT that they might vindicate the loss and impairment of its aforementioned rights; and by reason thereof, FRT requests payment by Defendants of reasonable attorney's fees pursuant to applicable statute..

## THIRD CAUSE OF ACTION

(Violation of Lanham Act-15 U.S.C. §1051 et seq.)

(against RHI)

(by FRT and ZSC)

80.  Plaintiff refers to and repleads each and every allegation contained in paragraphs 1 through 61 and each of them inclusively and by this reference incorporates the same herein and makes each a part thereof.

81.  The Agreement contained a provision for a Cabo Wabo Cantina System.

82.  On or about December 2007 [which was four months after the opening date that had been originally planned], FRT was informed that RHI did not have a Cabo Wabo Cantina System in place and never had designed or created such a system.

83.    During the marketing process, Defendants had willfully, knowingly and fraudulently misrepresented to FRT that it had a Cabo Wabo Cantina System.

-14-

84.    Hagar, Monroy, RHI, Skyy and Campari engaged in unfair trade practices when it induced FRT to enter into the Agreement based on fraudulent misrepresentations and omissions of material facts.

85.    Based on the pro forma analysis by RHI given to FRT during the marketing stage of the negotiations, FRT would have operating income of $19,788,982.00 over the first ten years..

86.    As a proximate cause of the aforementioned acts and omissions of Defendants, and each of them, and by reason thereof, ZSC was deprived of an approximate average monthly rental income from FRT in an amount of $38,560.00. The FRT/ZSC lease was a ten year lease.   The total rental loss to ZSC is approximately $4,627,000.00.   ZSC is entitled to treble damages in the amount of $12,960,000.00.

87.    As a proximate cause of the aforementioned acts and omissions of Defendants, FRT was deprived of operating income of $19,788,982.00 or an estimated $12,000,000.00 after tax profits.

88.    As a proximate cause of the aforementioned acts and omissions, FRT has incurred losses of $5,500,000.00

89.  By reason of the aforementioned acts and omissions of Defendants, and each of them, plaintiffs were required to and did retain several attorneys to defend themselves in many civil actions against them, and to render legal assistance to plaintiffs that they might vindicate themselves from in any civil action; and by reason thereof, plaintiffs request payment by defendants of all attorney's fees and litigation costs charged in those proceedings.

90.    By reason of the aforementioned acts and omissions of defendants, plaintiffs were required to and did retain an attorney to institute and prosecute the within action, and to render legal assistance to plaintiffs that they might vindicate

the loss and impairment of their aforementioned rights; and by reason thereof, plaintiffs request payment by defendants of reasonable attorney's fees pursuant to statute.

## FOURTH CAUSE OF ACTION

(Violation of Clayton Act-15 U.S.C. §14 et seq.)

(against RHI, Skyy and Campari)

(by FRT and ZSC)

91.  Plaintiff refers to and repleads each and every allegation contained in paragraphs 1 through 79 and each of them inclusively and by this reference incorporates the same herein and makes each a part thereof.

92.  RHI, Skyy and Campari tied the exclusive sale of Cabo Wabo tequila in the well as a condition of continuing to be a Licensee of RHI in violation of 15 U.S.C. §14 et seq.

93.   Based on the pro forma analysis by RHI given to FRT during the marketing stage of the negotiations, FRT would have operating income of $19,788,982.00 over the first ten years..

94.   As a proximate cause of the aforementioned acts and omissions of Defendants, and each of them, and by reason thereof, ZSC was deprived of an approximate average monthly rental income from FRT in an amount of $36,000.00. The FRT/ZSC lease was a ten year lease.  The total rental loss to ZSC is approximately $4,320,000.00.  ZSC is entitled to treble damages in the amount of $12,960,000.00.

95.   As a proximate cause of the aforementioned acts and omissions of Defendants, FRT was deprived of operating income of $19,788,982.00 or an estimated $12,000,000.00 after tax profits.

96.   As a proximate cause of the aforementioned acts and omissions of

defendants, FRT has incurred losses of $5,500,000.00

97.   By reason of the aforementioned acts and omissions of defendants, plaintiffs were required to and did retain several attorneys to defend themselves in many civil actions against them, and to render legal assistance to plaintiffs that they might vindicate themselves from in any civil action; and by reason thereof, plaintiffs request payment by defendants of all attorney's fees and litigation costs charged in those proceedings.

98.   By reason of the aforementioned acts and omissions of defendants, plaintiffs were required to and did retain an attorney to institute and prosecute the within action, and to render legal assistance to plaintiff that they might vindicate the loss and impairment of their aforementioned rights; and by reason thereof, plaintiffs request payment by defendants of reasonable attorney's fees pursuant to statute.

### FIFTH CAUSE OF ACTION

(RESCISSION OF LICENSE AGREEMENT)

(against RHI)

(by ZSC and FRT)

99.   Plaintiff refers to and repleads each and every allegation contained in paragraphs 1 through 61 and each of them inclusively and by this reference incorporates the same herein and makes each a part thereof.

100.   The Agreement dated December 7, 2006 is a franchise agreement, not a license agreement in that it provides for all three components of a franchise agreement; 1) use of trademark, 2) payment of fee and 3) control of licensee/franchisee.

101.   RHI and FRT agreed that FRT would use RHI's mark.  FRT agreed to pay fees of $175,000.00 and royalties of 8% of sales, and 3) RHI had imposed

-17-

virtual complete control of the design, construction and operation of the Cantina.

102.   Based on the willful and knowing misrepresentations of RHI and willing and knowing failure to register the offering with the Corporations Commissioner, FRT has the right, pursuant to California Corporations Code §31300, to rescind the Agreement.

103.   When FRT and RHI entered into the Agreement, there was a need for a facility to locate the Cantina.   With the full knowledge, consent and encouragement of RHI,  FRT executed a ten year lease with ZSC for the premises owned by ZSC.   RHI and FRT intended to confer a benefit on ZSC, i.e. the approximate average monthly rental income of $38,560.00.

104.   Based on the pro forma analysis by RHI given to FRT during the marketing stage of the negotiations, FRT would have operating income of $19,788,982.00 over the first ten years..

105.   As a proximate cause of the aforementioned acts and omissions of Defendants, and by reason thereof, ZSC was deprived of an approximate average monthly rental income of $38,560.00.  The lease was for ten years.  The total rental loss to ZSC is $4,627,000.00

106.   As a proximate cause of the aforementioned acts and omissions of Defendants, FRT was deprived of operating income of $19,788,982.00 or an estimated $12,000,000.00 after tax profits.

107.   As a proximate cause of the aforementioned acts and omissions, FRT has incurred losses of $5,500,000.00

108.   The aforementioned acts and omissions of defendants were done by defendants knowingly, intentionally and maliciously for the purpose of inflicting mental pain, oppression and emotional distress upon plaintiffs, and in reckless, wanton and callous disregard of plaintiff's well-being and security; and by reason

thereof, plaintiffs claim exemplary and punitive damages from defendants in the sum of One Hundred Million Dollars ($100,000,000.00).

109.   By reason of the aforementioned acts and omissions of defendants, plaintiffs were required to and did retain several attorneys to defend themselves in many civil actions against them, and to render legal assistance to plaintiffs that they might vindicate themselves from in any civil action; and by reason thereof, plaintiffs request payment by defendants of all attorney's fees and litigation costs charged in those proceedings.

110.   By reason of the aforementioned acts and omissions of defendants, plaintiffs were required to and did retain an attorney to institute and prosecute the within action, and to render legal assistance to plaintiffs that he might vindicate the loss and impairment of his aforementioned rights; and by reason thereof, plaintiffs request payment by defendant of reasonable attorney's fees pursuant to statute.

**SIXTH CAUSE OF ACTION**

(RESCISSION OF LICENSE AGREEMENT)

(against RHI)

(by ZSC and FRT)

111.   Plaintiff refers to and repleads each and every allegation contained in paragraphs 1 through 61 and Paragraphs 100 through 110 and each of them inclusively and by this reference incorporates the same herein and makes each a part thereof.

112.   The Agreement is a contract of adhesion and therefore, unenforceable per se.

113.   There was an absence of real negotiation and a disparity of bargaining power between the RHI and FRT.

114.   California courts have long recognized that franchise agreements are

contracts of adhesion because of the vastly superior bargaining strength of the franchisor.   California law treats contracts of adhesion as procedurally unconscionable.

115.   The Agreement was unconscionable at the time it was made and is not enforceable in that the Agreement was marketed as a license not a franchise.

116.   RHI implemented the Agreement as though it were a franchise not a license.

117.   Based on the unconscionibility of the contract at the time it was made and the knowing misrepresentations of RHI, FRT has the right, pursuant to California Corporations Code §31300, to rescind the Agreement.

118.   Based on the pro forma analysis by RHI given to FRT during the marketing stage of the negotiations, FRT would have operating income of $19,788,982.00 over the first ten years.

119.   As a proximate cause of the aforementioned acts and omissions of Defendants, and by reason thereof, ZSC was deprived of an approximately average monthly rental income of $38,627.00.  The lease was for ten years.  The total rental loss to ZSC is $4,627.000.00

120.   As a proximate cause of the aforementioned acts and omissions of Defendants, FRT was deprived of operating income of $19,788,982.00 or an estimated $12,000,000.00 after tax profits.

121.   As a proximate cause of the aforementioned acts and omissions, FRT has incurred losses of $5,500,000.00

122.   The aforementioned acts and omissions of defendants was done by defendants knowingly, intentionally and maliciously for the purpose of inflicting mental pain, oppression and emotional distress upon plaintiffs, and in reckless, wanton and callous disregard of plaintiff's well-being and security; and by reason

thereof, plaintiff claims exemplary and punitive damages from defendants in the sum of One Hundred Million Dollars ($100,000,000.00).

123.   By reason of the aforementioned acts and omissions of defendants, plaintiffs were required to and did retain several attorneys to defend themselves in many civil actions against them, and to render legal assistance to plaintiffs that they might vindicate themselves from in any civil action; and by reason thereof, plaintiffs request payment by defendants of all attorney's fees and litigation costs charged in those proceedings.

124.   By reason of the aforementioned acts and omissions of defendants, plaintiffs were required to and did retain an attorney to institute and prosecute the within action, and to render legal assistance to plaintiff that they might vindicate the loss and impairment of their aforementioned rights; and by reason thereof, plaintiffs request payment by defendant of reasonable attorney's fees pursuant to statute.

## SEVENTH CAUSE OF ACTION

### (RESCISSION OF CONFIDENTIAL SETTLEMENT AGREEMENT)

### (against RHI)

### (by Barbis and FRT)

125.   Plaintiff refers to and repleads each and every allegation contained in paragraphs 1 through 61 and Paragraphs 100 through 124, each of them inclusively and by this reference incorporates the same herein and makes each a part thereof.

126.   On or about December 22, 2008, RHI initiated a federal action in violation of the Agreement.  Paragraph 16 of the Licensing Agreement sets forth the dispute resolution process.  RHI did not make any attempt to comply with ¶16.

127.  On or about March 19, 2009, FRT and RHI entered into a Confidential Settlement Agreement (hereinafter "CSA").  This CSA is void in that the judicial proceedings filed that resulted in the CSA were initiated in violation of ¶16.

128.   Based on the pro forma analysis by RHI given to FRT during the marketing stage of the negotiations, FRT would have operating income of $19,788,982.00 over the first ten years.

129.   As a proximate cause of the aforementioned acts and omissions of Defendants, FRT was deprived of operating income of $19,788,982.00 or an estimated $12,000,000.00 after tax profits.

130.   As a proximate cause of the aforementioned acts and omissions, FRT has incurred losses of $5,500,000.00

131.   The aforementioned acts and omissions of defendants were done by defendants knowingly, intentionally and maliciously for the purpose of inflicting mental pain, oppression and emotional distress upon plaintiffs, and in reckless, wanton and callous disregard of plaintiff's well-being and security; and by reason thereof, plaintiff claims exemplary and punitive damages from defendants in the sum of One Hundred Million Dollars ($100,000,000.00).

132.   By reason of the aforementioned acts and omissions of defendants, and plaintiffs were required to and did retain several attorneys to defend themselves in many civil actions against them, and to render legal assistance to plaintiffs that they might vindicate them from in any civil action; and by reason thereof, plaintiffs request payment by defendants of all attorney's fees and litigation costs charged in those proceedings.

133.   By reason of the aforementioned acts and omissions of defendants, plaintiffs were required to and did retain an attorney to institute and prosecute the within action, and to render legal assistance to plaintiffs that they might vindicate the loss and impairment of their aforementioned rights; and by reason thereof, plaintiffs request payment by defendant of reasonable attorney's fees pursuant to statute.

## EIGHTH  CAUSE OF ACTION

(RESCISSION OF CONFIDENTIAL SETTLEMENT AGREEMENT)

(against RHI)

(by Barbis, ZSC and  FRT)

134.  Plaintiff refers to and repleads each and every allegation contained in paragraphs 1 through 61 and Paragraphs 100 through 133 each of them inclusively and by this reference incorporates the same herein and makes each a part thereof.

135.   On or about March 19, 2009, FRT and RHI entered into a Confidential Settlement Agreement (hereinafter "CSA").

136.   The CSA is a contract which fails for lack of adequate consideration; the consideration received by FRT and Barbis was nominal and insignificant.

137.   The CSA is a contract which fails because Barbis and FRT did not freely enter into the contract.  Apparent consent was not real or free in that it was obtained through duress, menace, fraud, undue influence and/or mistake.

138.   Barbis and FRT were under extreme duress and performed an act which otherwise would not have been performed and acquiesced in an act to which they otherwise would not have submitted.  Hagar told Barbis that he [Hagar] was going to kill him.  Barbis was told by a third party that there was a "hitman" hired to kill Barbis unless he [Barbis] settled the case.

139.    FRT and Barbis was unduly influenced to executed the CSA when their counsel threatened to withdraw from the case unless they signed the CSA. FRT and Barbis' counsel continued to represent them only if they executed the CSA.

140.   FRT and Barbis allege economic duress which can be a basis for rescission of a settlement agreement where there are circumstances in that RHI and Hagar committed wrongful acts which were sufficiently coercive to cause a

-23-

reasonably prudent person faced with no reasonable alternative to succumb to RHI's and Hagar's pressure.

141.   Pursuant to California Corporations Code §31512 as well as common law rescission , FRT and Barbis request the court to order rescission of the CSA.

142.    Based on the pro forma analysis by RHI given to FRT during the marketing stage of the negotiations, FRT would have operating income of $19,788,982.00 over the first ten years.

143.   As a proximate cause of the aforementioned acts and omissions of Defendants, and by reason thereof, ZSC was deprived of an approximately average monthly rental income of $38, 560.00.  The lease was for ten years.  The total rental loss to ZSC is $4,627,000.00

144.   As a proximate cause of the aforementioned acts and omissions of Defendants, FRT was deprived of operating income of $19,788,982.00 or an estimated $12,000,000.00 after tax profits.

145.   As a proximate cause of the aforementioned acts and omissions, FRT has incurred losses of $5,500,000.00

146.   By reason of the aforementioned acts and omissions of defendants, plaintiffs were required to and did retain several attorneys to defend themselves in many civil actions against them, and to render legal assistance to plaintiffs that they might vindicate themselves from in any civil action; and by reason thereof, plaintiffs request payment by defendants of all attorney's fees and litigation costs charged in those proceedings.

147.   By reason of the aforementioned acts and omissions of defendants, plaintiffs were required to and did retain an attorney to institute and prosecute the within action, and to render legal assistance to plaintiffs that they might vindicate the loss and impairment of their aforementioned rights; and by reason thereof,

plaintiffs request payment by defendants of reasonable attorney's fees pursuant to statute.

## NINTH CAUSE OF ACTION

(Rescission of Confidential Settlement Agreement)

(against RHI, Skyy, Campari, Hagar and Monroy)

(by FRT, ZSC and Barbis)

148.  Plaintiff refers to and repleads each and every allegation contained in paragraphs 1 through 201 and Paragraphs 100 through 147 and each of them inclusively and by this reference incorporates the same herein and makes each a part thereof.

149.  Plaintiffs alleges that Defendants entered into the CSA for the purpose of defrauding the United States and the State of California of taxes which FRT owed and to which Barbis was individually liable.

150.   Plaintiffs allege the Defendants were aware of the employment tax liability of FRT and that FRT was going to pay that tax liability.

151.  Plaintiffs allege that Defendants induced FRT and Barbis to divert the funds which were going to be used to pay taxes, to defendants in settlement of their action against FRT and Barbis.

152.   In that the CSA was used to divert funds set aside for taxes, the CSA is void as a matter of law.

153.   As a proximate cause of the acts and omissions of Defendants, Plaintiffs were injured in that $57,689.29 that would have been used to pay taxes, was instead paid to Defendants in settlement and Plaintiff is still liable for those taxes.

# TENTH CAUSE OF ACTION

## (BREACH OF CONTRACT)

### (against RHI)

### (by FRT and ZSC)

154.  Plaintiff refers to and repleads each and every allegation contained in paragraphs 1 through 153 and each of them inclusively and by this reference incorporates the same herein and makes each a part thereof.

155.    The Agreement provides that RHI will deliver the Cabo Wabo Cantina System not less than four months before the scheduled opening of the Cantina.

156.    The original scheduled opening date for the Cantina was August 1, 2007.

157    The Agreement provided and required the Cabo Wabo Cantina System to be delivered to FRT no later than April 1, 2007.

158.  The Cabo Wabo Cantina System was not delivered by April 1, 2007.

159.  The Cantina actually opened on August 28, 2008; RHI never delivered any Cabo Wabo Cantina System to FRT.

160.    FRT opened the Cantina on August 28, 2008 without any operating system in place which produced a substantial diminution in profits and something just less than chaos in the operations of the Cantina.

161.  As a proximate cause of not having an operating system in place, the business was operated on a day-to-day basis with decisions being made on a minute-to-minute basis.  As a result, the expenses of operating the business exceeded the pro forma by large amounts.

162.  The failure to deliver the Cabo Wabo Cantina System was a material

breach of the Agreement.

163.   The Agreement provides that Hagar would appear at the grand opening of the Cantina.

164.   The grand opening was August 28, 2008.

165.   Hagar failed to appear at the Cantina on August 28, 2008.

166.   Hagar's failure to appear at the opening, in violation of the Agreement, is a material breach of the Agreement.

167.   After Hagar failed to appear at the opening on August 28, 2008, Hagar, on September 15, 2008, demanded a new contract with FRT where Hagar would appear for two days [on October 28 and 29, 2008] for a fee of $9,230.00 per night].  The charging of a fee was a material breach of the Agreement.

168.   On October 23, 2008, Hagar unilaterally canceled the September 15, 2008 contract and demanded another new contract for October 28, 2008 for $28,000.00 for the one night.  The charging of a fee was a material breach of the Agreement.

169.   Hagar appeared on October 28, 2008.

170.   Based on the pro forma analysis by RHI given to FRT during the marketing stage of the negotiations, FRT would have operating income of $19,788,982.00 over the first ten years.

171.   As a proximate cause of the aforementioned acts and omissions of Defendants, and by reason thereof, ZSC was deprived of the monthly rental income of $38,560.00.   The lease was for ten years.   The total rental loss to ZSC is $4,627,000.00.

172.   As a proximate cause of the aforementioned acts and omissions of Defendants, FRT was deprived of operating income of $19,788,982.00 or an estimated $12,000,000.00 after tax profits.

173.   As a proximate cause of the aforementioned acts and omissions, FRT has incurred losses of $5,500,000.00

174.   By reason of the aforementioned acts and omissions of defendants, plaintiffs were required to and did retain several attorneys to defend themselves in many civil actions against them, and to render legal assistance to plaintiffs that they might vindicate themselves from in any civil action; and by reason thereof, plaintiffs request payment by defendants of all attorney's fees and litigation costs charged in those proceedings.

175.   By reason of the aforementioned acts and omissions of defendants, plaintiffs were required to and did retain an attorney to institute and prosecute the within action, and to render legal assistance to plaintiffs that they might vindicate the loss and impairment of his aforementioned rights; and by reason thereof, plaintiffs request payment by defendants of reasonable attorney's fees pursuant to statute.

## ELEVENTH CAUSE OF ACTION

(Violation of Public Policy)

(against RHI)

(by FRT)

176.  Plaintiff refers to and repleads each and every allegation contained in paragraphs 1 through 175 and each of them inclusively and by this reference incorporates the same herein and makes each a part thereof.

177.  The Agreement exceeds the limitations of a license agreement in that it provides for the use of RHI's mark, payment in excess of $500.00 and RHI exercises extensive control over FRT.

178.  The Agreement meets all the requirements of a franchise agreement.

179.  Public policy sets forth that an agreement where the licensor/franchisor

who has misrepresented its product[s], failed to register its product[s], breached the license/franchise agreement with the licensee/franchisee, is voidable and unenforceable.

180    Based on the pro forma analysis by RHI given to FRT during the marketing stage of the negotiations, FRT would have operating income of $19,788,982.00 over the first ten years..

181.   As a proximate cause of the aforementioned acts and omissions of Defendants, and by reason thereof, ZSC was deprived of an approximately average monthly rental income of $38,560.00  The lease was for ten years.  The total rental loss to ZSC is $4,627,000.00

182.   As a proximate cause of the aforementioned acts and omissions of Defendants, FRT was deprived of operating income of $19,788,982.00 or an estimated $12,000,000.00 after tax profits.

183.   As a proximate cause of the aforementioned acts and omissions, FRT has incurred losses of $5,500,000.00

184.   The aforementioned acts and omissions of defendants were done by defendants knowingly, intentionally and maliciously for the purpose of inflicting mental pain, oppression and emotional distress upon plaintiffs, and in reckless, wanton and callous disregard of plaintiff's well-being and security; and by reason thereof, plaintiff claims exemplary and punitive damages from defendants in the sum of One Hundred Million Dollars ($100,000,000.00).

185.   By reason of the aforementioned acts and omissions of defendants, plaintiffs were required to and did retain several attorneys to defend themselves in many civil actions against them, and to render legal assistance to plaintiffs that they might vindicate themselves from in any civil action; and by reason thereof, plaintiffs request payment by defendants of all attorney's fees and litigation costs

charged in those proceedings.

186.   By reason of the aforementioned acts and omissions of defendants, plaintiffs were required to and did retain an attorney to institute and prosecute the within action, and to render legal assistance to plaintiff that they might vindicate the loss and impairment of their aforementioned rights; and by reason thereof, plaintiffs request payment by defendants of reasonable attorney's fees pursuant to statute.

**TWELFTH CAUSE OF ACTION**

(Common Law Fraud)

(against RHI, Hagar and Monroy)

(by FRT and ZSC)

187.  Plaintiff refers to and repleads each and every allegation contained in paragraphs 1 through 186 and each of them inclusively and by this reference incorporates the same herein and makes each a part thereof.

188.   Defendants engaged in a series of intentional misrepresentations including but not limited to:

a.   RHI, Hagar and Monroy represented that RHI had a Cabo Wabo Cantina System when in fact, there was no Cabo Wabo Cantina System.

b.   RHI, Hagar and Monroy represented that Hagar would appear at the opening of the Cantina when in fact, Hagar did not appear at the opening.

C.   RHI, Hagar and Monroy represented that FRT was purchasing a license to use the trademarks known as Cabo Wabo and Cabo Wabo Cantina when, in fact, FRT was contracting to purchase a franchise from RHI and would be under close supervision and control of RHI.

189.   Defendants engaged in a series of omissions, including but not limited to:

a.   Prior to and at the execution of the Agreement and for nine months thereafter, RHI, Skyy, and Campari failed to advise FRT that there was no Cabo Wabo Cantina System and RHI was depending on FRT to design, create and implement a operational system for the Cantina.

b.   Prior to and at the execution of the Agreement and for nine months thereafter, RHI, Skyy, and Campari failed to advise FRT that the tequila it could serve at the Cantina would be limited to Cabo Wabo tequila.

190   Plaintiffs, relied, to their detriment on the aforementioned misrepresentations.

191.   Based on the pro forma analysis by RHI given to FRT during the marketing stage of the negotiations, FRT would have operating income of $19,788,982.00 over the first ten years..

192.   As a proximate cause of the aforementioned acts and omissions of Defendants, and by reason thereof, ZSC was deprived of an approximately average monthly rental income of $38,560.00.  The lease was for ten years.  The total rental loss to ZSC is $4,627,000.00.

193.   As a proximate cause of the aforementioned acts and omissions of Defendants, FRT was deprived of operating income of $19,788,982.00 or an estimated $12,000,000.00 after tax profits.

194.   As a proximate cause of the aforementioned acts and omissions, FRT has incurred losses of $5,500,000.00

195.   The aforementioned acts and omissions of defendants were done by defendants knowingly, intentionally and maliciously for the purpose of inflicting

mental pain, oppression and emotional distress upon plaintiffs, and in reckless, wanton and callous disregard of plaintiff's well-being and security; and by reason thereof, plaintiff claims exemplary and punitive damages from defendants in the sum of One Hundred Million Dollars ($100,000,000.00).

196.   By reason of the aforementioned acts and omissions of defendants, plaintiffs were required to and did retain several attorneys to defend themselves in any civil actions against them, and to render legal assistance to plaintiff that they might vindicate him from in any civil action; and by reason thereof, plaintiffs request payment by defendants of all attorney's fees and litigation costs charged in those proceedings.

197.   By reason of the aforementioned acts and omissions of defendants, plaintiffs were required to and did retain an attorney to institute and prosecute the within action, and to render legal assistance to plaintiffs that they might vindicate the loss and impairment of their aforementioned rights; and by reason thereof, plaintiffs request payment by defendant of reasonable attorney's fees pursuant to statute.

**THIRTEENTH CAUSE OF ACTION**

(Intentional Infliction of Emotional Distress)

(against RHI, Hagar and Monroy)

(by FRT)

198.  Plaintiff refers to and repleads each and every allegation contained in paragraphs 1 through 197 and each of them inclusively and by this reference incorporates the same herein and makes each a part thereof.

199.   RHI, Skyy and Campari through the extreme and outrageous conduct of Hagar and Monroy with the intention of causing extreme emotional distress and the reckless disregard of the probability of causing emotional distress caused Barbis

to suffer severe and/or extreme emotional distress. The actual and proximate cause of the emotional distress was Defendants' outrageous and extreme conduct.

200.  As a proximate cause of the aforementioned acts and omissions, Barbis has incurred losses of $5,500,000.00.

201.   The aforementioned acts and omissions of defendants were done by defendants knowingly, intentionally and maliciously for the purpose of inflicting mental pain, oppression and emotional distress upon plaintiffs, and in reckless, wanton and callous disregard of plaintiff's well-being and security; and by reason thereof, plaintiff claims exemplary and punitive damages from defendants in the sum of One Hundred Million Dollars ($100,000,000.00).

202.   By reason of the aforementioned acts and omissions of defendants, and plaintiff were required to and did retain several attorneys to defend himself in many civil actions against him, and to render legal assistance to plaintiff that they might vindicate him from in any civil action; and by reason thereof, plaintiff requests payment by defendants of all attorney's fees and litigation costs charged in those proceedings.

## FOURTEENTH CAUSE OF ACTION

(Mail Fraud and Wire Fraud-18 U.S.C. §1841 & 1843)

(against RHI, Skyy, Campari, Hagar and Monroy)

(by FRT, ZSC and Barbis)

203.  Plaintiff refers to and repleads each and every allegation contained in paragraphs 1 through 202 and each of them inclusively and by this reference incorporates the same herein and makes each a part thereof.

204.  Plaintiffs alleges that Defendants used the United States Mail and interstate wires to commit the fraudulent acts alleged in all of the other causes of

action set forth in this Complaint.

205.    As a proximate cause of the acts and omissions of Defendants, Plaintiffs were injured in their business as follows:

a.    Based on the pro forma analysis by RHI given to FRT during the marketing stage of the negotiations, FRT would have operating income of $19,788,982.00 over the first ten years.

b.    As a proximate cause of the aforementioned acts and omissions of Defendants, and by reason thereof, ZSC was deprived of the monthly rental income of $38,560.00.00.  The lease was for ten years.  The total rental loss to ZSC is $4,727,000.00.

c.    As a proximate cause of the aforementioned acts and omissions of Defendants, FRT was deprived of operating income of $19,788,982.00 or an estimated $12,000,000.00 after tax profits.

d.    As a proximate cause of the aforementioned acts and omissions, FRT has incurred losses of $5,500,000.00

e.    By reason of the aforementioned acts and omissions of defendants, and plaintiff were required to and did retain several attorneys to defend himself in many civil actions against him, and to render legal assistance to plaintiff that they might vindicate him from in any civil action; and by reason thereof, plaintiff requests payment by defendants of all attorney's fees and litigation costs charged in those proceedings.

f.    By reason of the aforementioned acts and omissions of defendants, plaintiff were required to and did retain an attorney to institute and prosecute the within action, and to render legal assistance to plaintiff that he might vindicate the loss and impairment of his aforementioned

rights; and by reason thereof, plaintiff requests payment by defendant of reasonable attorney's fees pursuant to statute.

### FIFTEENTH CAUSE OF ACTION

(Intentional Interference with Prospective Economic Advantage)

(against RHI, Hagar and Monroy)

(by FRT and ZSC)

206.  Plaintiff refers to and repleads each and every allegation contained in paragraphs 1 through 205 and each of them inclusively and by this reference incorporates the same herein and makes each a part thereof.

207.  ZSC had an economic relationship with FRT, with the probability of future economic benefit to the both parties.

208.  RHI, Hagar and Monroy had knowledge of the economic relationship [the lease].

209.  RHI, Hagar and Monroy engaged in intentional acts designed to disrupt the relationship.

210.  There was an actual disruption of the relationship [the lease was breached][the business was closed].

211;  ZSC suffered economic harm proximately caused by the acts of the RHI, Hagar and Monroy.

212.  As a proximate cause of the acts and omissions of Defendants, Plaintiffs were injured in their business as follows:

a.  Based on the pro forma analysis by RHI given to FRT during the marketing stage of the negotiations, FRT would have operating income of $19,788,982.00 over the first ten years.

b.  As a proximate cause of the aforementioned acts and omissions of Defendants, and by reason thereof, ZSC was deprived of an

-35-

1    approximately average monthly rental income of $38,560.00.  The

2    lease was for ten years.  The total rental loss to ZSC is $4,627,000.00.

3  c.    As a proximate cause of the aforementioned acts and omissions of

4    Defendants, FRT was deprived of operating income of

5    $19,788,982.00 or an estimated $12,000,000.00 after tax profits.

6  d.    As a proximate cause of the aforementioned acts and omissions, FRT

7    has incurred losses of $5,500,000.00

8  e.    By reason of the aforementioned acts and omissions of defendants,

9    and plaintiffs were required to and did retain several attorneys to

10    defend himself in many civil actions against him, and to render legal

11    assistance to plaintiff that they might vindicate him from in any civil

12    action; and by reason thereof, plaintiff requests payment by

13    defendants of all attorney's fees and litigation costs charged in those

14    proceedings.

15  f.    By reason of the aforementioned acts and omissions of defendants,

16    plaintiffs were required to and did retain an attorney to institute and

17    prosecute the within action, and to render legal assistance to plaintiffs

18    that they might vindicate the loss and impairment of their

19    aforementioned rights; and by reason thereof, plaintiffs request

20    payment by defendant of reasonable attorney's fees pursuant to

21    statute.

22

23    **WHEREAS**, plaintiff  prays for damages against Defendants and each of

24  them, as follows:

25    1.  General damages in amount to be shown according to proof;

26    2.  Punitive and exemplary damages, from each defendant, for each cause of

27  action in which punitive damages are permitted in the sum of $100,000,000.00;

28    3.   Reasonable attorney's fees, costs and expenses as permitted by law

1    according to proof;

2         4.  Such other and further relief as this Court may deem proper, appropriate

3    and just.

4

5    Dated: October 4, 2010        _____

6                                                    RICHARD HAMLISH
                                                        Counsel for Plaintiffs

7

8

9
                                    **<u>DEMAND FOR JURY TRIAL</u>**
10
              Pursuant to **<u>Federal Rules of Civil Procedure Rule 38</u>**, plaintiff hereby
11
     demands a trial by jury.
12

13
     Dated: October 4, 2010        _____
14
                                                    RICHARD HAMLISH
                                                        Counsel for Plaintiffs
15

16

17

18

19

20

21

22

23

24

25

26

27

28